IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

MARIA VELEZ,

    Plaintiff,

    v.                      CIVIL NO. 05-2108 (RLA)

MARRIOTT PR MANAGEMENT, INC.,
et al.,

    Defendants.

## ORDER IN THE MATTER OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants SAN JUAN MARRIOTT RESORT AND STELLARIS CASINO and MARRIOTT P.R. MANAGEMENT CORP. ("MARRIOTT") have moved the court to enter summary judgment on their behalf and to dismiss plaintiff's complaint. The court having reviewed the memoranda filed by the parties as well as the documents submitted in support thereof hereby rules as follows.

### I. BACKGROUND

Plaintiff instituted this action alleging sex discrimination and retaliation pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1). Additionally, plaintiff seeks relief under Puerto Rico Act No. 100 of June 30, 1959, P.R. Laws Ann. tit. 29, §§ 146 *et seq.* (2002) and Puerto Rico Act No. 69 of July 6, 1985, Laws of P.R. Ann. tit. 29, §§ 1321 *et seq.* (2002), two local discrimination statutes.

In essence, plaintiff claims that she was not selected for a "Pit Boss" position at the MARRIOTT's Casino in March 2004 based on sex discrimination. Plaintiff further avers that MARRIOTT subsequently retaliated against her for having complained of the aforementioned rejection for promotion.

We shall initially address two preliminary issues raised by the defendants which bear upon the evidence which will be available to plaintiff to prove her claims which are, her previous non-selection to Pit Boss positions in 1996, 1997 and 1999 and plaintiff's pattern or practice claim.

## II. PREVIOUS NON-SELECTION TO PIT BOSS POSITIONS

Defendants contend that plaintiff's non-selection for the Pit Boss positions during the years 1996, 1997 and 1999 constitute alleged discrete acts of discrimination which are time-barred inasmuch as she failed to timely exhaust the corresponding administrative remedies as mandated by Title VII.

Plaintiff amended her complaint on April 3, 2006 (docket No. 23) to include allegations of a systemic discriminatory practice. Specifically, the amended pleading avers that "[p]laintiff, as well as other female employees have not been promoted as part of a **de facto** policy of denial of Pit Boss promotions to female employees." Amended Complaint ¶ 15 (emphasis in original). Further, plaintiff charges that "[d]efendant's general practice regarding the hiring and promotion of employees from the *Pit Boss* position have been ongoing

and can be described as a systemic violation of Plaintiff's rights." Amended Complaint ¶ 25 (italics in original).

Plaintiff concludes by alleging that "Defendant's *de facto* policy denying Pit Boss promotions to female employees constitutes a systemic and/or serial violation of Plaintiff's rights. An employer's continued and consistent discrimination, coupled with his refusal to correct a discriminatory practice, present a systemic violation which has resulted in reiterated unlawful refusals to grant promotions." Amended Complaint ¶ 30.

Prior to resorting to the courts for relief, plaintiffs must present their discrimination claims under Title VII to the appropriate agency. Jorge v. Rumsfeld, 404 F.3d 556, 564 (1st Cir. 2005); Noviello v. City of Boston, 398 F.3d 76, 85 (1st Cir. 2005); Lebron-Rios v. U.S. Marshal Service, 341 F.3d 7, 13 (1st Cir. 2003); Dressler v. Daniel, 315 F.3d 75, 78 (1st Cir. 2003); Clockedile v. New Hampshire Dept. of Corrections, 245 F.3d 1, 3 (1st Cir. 2001).

"[A] claimant who seeks to recover for an asserted violation of... Title VII, first must exhaust administrative remedies by filing a charge with the EEOC, or alternatively, with an appropriate state or local agency, within the prescribed time limits.... This omission, if unexcused, bars the courthouse door, as courts long have recognized that Title VII's charge-filing requirement is a prerequisite to the commencement of suit." Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 278 (1st Cir. 1999).

The purpose behind the exhaustion requirement is to give the employer timely notice of the events as well as provide an opportunity for an early amicable resolution of the controversy. "That purpose would be frustrated... if the employee were permitted to allege one thing in the administrative charge and later allege something entirely different in a subsequent civil action." Lattimore v. Polaroid Corp., 99 F.3d 454, 464 (1st Cir. 1996).

In Puerto Rico an aggrieved employee has 300 days from the occurrence of the employment action complained of to file an administrative charge in instances where the local Department of Labor is empowered to provide relief, i.e., in instances of "deferral" jurisdiction. Lebron-Rios, 341 F.3d at 11 n.5; Bonilla, 194 F.3d at 278 n.4. Otherwise, the applicable period is 180 days. See, 42 U.S.C. § 2000e-5(e)(1).[1]

---

[1]   In pertinent part, § 2000e-5(e)(1) reads:

> A charge under this section shall be filed within **one hundred and eighty days** after the alleged unlawful employment practice occurred... except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a state or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto... such charge shall be filed by or on behalf of the person aggrieved within **three hundred days** after the alleged unlawful employment practice occurred.

(Emphasis ours).

In <u>Nat'l R.R. Passenger Corp. v Morgan</u>, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) the Supreme Court redefined the factors to be used by the courts in examining allegations of continuing violations in suits brought by individual claimants and did away with the "systemic" or "serial" dichotomy previously used for extending the limitations period.[2] "<u>Morgan</u> eliminates the need for juries to determine whether there was a systemic or serial violation in order to invoke the continuing violations doctrine". <u>Crowley v. L.L. Bean, Inc.</u>, 303 F.3d 387, 410 (1st Cir. 2002). The Supreme Court distinguished instead between "discrete discriminatory acts" and "hostile work environment claims" for purposes of determining the timeliness of Title VII actions brought by individual plaintiffs.

According to the Supreme Court, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." <u>Morgan</u>, 536 U.S. at 112. The Supreme Court went on to list specific events which it concluded constituted distinctive actionable claims which marked the term for the limitations period to run.

Discrete acts such as **termination, failure to promote, denial of transfer, or refusal to hire** are easy to

---

[2] <u>Morgan</u> did not extend its ruling to pattern-or-practice claims. In this regard, the Supreme Court specifically indicated that "[w]e have no occasion here to consider the timely filing question with respect to 'pattern-or-practice' claims brought by private litigants as none are at issue here." <u>Morgan</u>, 536 U.S. at 115 n.9.

identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." *Id*. at 114 (emphasis ours).

On the other hand, "[h]ostile environmental claims are different in kind from discrete acts. Their very nature involves repeated conduct... The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id*. at 115. "As long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has 'occurred,' even if it is still occurring. Subsequent events, however, may still be part of the one hostile work environment claim and a charge may be filed at a later date and still encompass the whole." *Id*. at 117.

Illustrating the underlying difference between hostile work environment claims and other discrimination claims, the Court of Appeals in Campbell v. Bankboston, N.A., 327 F.3d 1, 11 (1st Cir. 2003) stated that the limitations period for an alleged discriminatory change in retirement benefits plan began to run upon plaintiff being advised of the decision. Likewise, following the Morgan precedent in Rosario-Rivera v. P.R. Aqueduct and Sewers Auth., 331 F.3d. 183 (1st Cir. 2003), the court rejected plaintiff's notion

that two employment transfers were part of a continuing violation for purposes of the [Title VII] limitations period under a hostile work environment scheme. Rather, the court specifically determined that each such transfer constituted "'a separate and actionable unlawful employment practice.'" *Id.* at 188-89 (citing <u>Morgan</u>, 536 U.S. at 114). *See also*, <u>Dressler v. Daniel</u>, 315 F.3d 75 (1st Cir. 2003) (two separate claims with individual limitations period accruing from the denial of prospective employment and termination from employment); <u>Miller v. New Hampshire Dept. of Corrections</u>, 296 F.3d 18, 22 (1st Cir. 2002) (distinguishing "a discrete act of discrimination - as opposed to a pattern of harassing conduct that, taken as a whole, constitutes a hostile work environment [and falls within the continuing violations exception to the limitations period]." *Accord*, <u>Marrero v. Goya de Puerto Rico, Inc.</u>, 304 F.3d 7 (1st Cir. 2002) finding hostile work environment claims timely under the <u>Morgan</u> premise.

Based on the foregoing, it is beyond cavil that the three specific instances of plaintiff's non-selection to the Pit Boss positions in 1996, 1997 and 1999 fall squarely within the discrete acts of discrimination as defined in <u>Morgan</u>. Hence, plaintiff was required to file individual administrative charges with respect to each one of these alleged discriminatory events within 300 days thereafter. It is undisputed that plaintiff in this case failed to do

so for which reason any claims based on these non-selections have become stale.[3]

Accordingly, defendants' request for dismissal of plaintiff's discrimination claim based on her non-selection to the Pit Boss positions in the years **1996, 1997** and **1999** is **GRANTED** and it is hereby **DISMISSED AS UNTIMELY.**

### III. PATTERN OR PRACTICE

In response to defendant's untimeliness arguments regarding alleged past discriminatory events, plaintiff further adduces the existence of a pattern or practice of discrimination. In her memoranda plaintiff argues that defendant "presents a distorted view of the evidentiary requirement for establishing patterns and practices that constitute sytematic [sic] violations." Plaintiff's Sur-Reply (docket No. 120) p. 27.

At the outset, it is important to note that pattern or practice discrimination does not constitute an independent cause of action but rather an additional procedural vehicle available for establishing disparate discriminatory treatment. "A pattern or practice case is

---

[3] This evidence, however, may still prove relevant for plaintiff to establish her case. "A discriminatory action for which a claim was not timely filed cannot be used as a basis for award relief but can be used as background in support of later claims of gender discrimination." DeClaire v. Mukasey, 530 F.3d 1, 18 (1st Cir. 2008). See also, Morgan, 536 U.S. at 112 ("'[i]t may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue'" (citing United Air Lines, Inc. v. Evans, 431 U.S. 553, 557 97 S.Ct. 1885, 52 L.Ed. 571 (1977)).

**CIVIL NO. 05-2108 (RLA)**                                          **Page 9**

not a separate and free-standing cause of action... but is really merely another method by which disparate treatment can be shown." Celestine v. Petroleos de Venezuela S.A., 266 F.3d 343, 355 (5th Cir. 2001) (citation and internal quotation marks omitted).

In Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) the United States Supreme Court described the mechanics of pattern or practice. Referring to the legislative history of Title VII, the court cited the explanation proffered by Senator Hubert Humphrey as to the meaning of the "pattern or practice" language in the statute as follows:

> [A] pattern or practice would be present only where the denial of rights consists of something more than an isolated, sporadic incident, but it is repeated, routine, or of a generalized nature. There would be a pattern or practice if, for example, a number of companies or persons in the same industry or line of business discriminated, if a chain of motels or restaurants practiced racial discrimination throughout all or a significant part of its system, or if a company repeatedly and regularly engaged in acts prohibited by the statute.
>
>                          . . . .
>
> The point is that single, insignificant, isolated acts of discrimination by a single business would not justify a finding of a pattern or practice....

**CIVIL NO. 05-2108 (RLA)**                                    **Page 10**

Teamsters, 431 U.S. at 336 n.16

The pattern or practice suit is prosecuted in two phases. Plaintiff must initially prove a pattern or practice of discrimination exists which raises a presumption that all protected class members are affected thereby. The burden then shifts to the employer to establish that decisions regarding particular class members were not based on impermissible discriminatory criteria.

Pattern-or-practice cases are typically tried in two or more stages. During the first stage of trial, the plaintiffs' burden is to demonstrate that an unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers. Thus, at the initial liability stage of a pattern-or-practice suit the plaintiffs are not required to offer evidence that each person for whom they will ultimately seek relief was a victim of the employer's discriminatory policy. Instead, plaintiffs' burden is to establish that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the plaintiffs' proof is either inaccurate or insignificant. If an employer fails to rebut the inference that arises from the plaintiffs' prima facie case, the finder of fact can conclude that a violation has occurred and the trial court can award prospective

CIVIL NO. 05-2108 (RLA)                                    **Page 11**

equitable relief. If the plaintiffs also seek individual relief for the victims of the discriminatory practice, the case moves into the second or subsequent stages. In these additional proceedings, it must be determined whether each individual plaintiff was a victim of the discriminatory practices. Importantly, by having prevailed in the first stage of trial, the individual plaintiffs reap a significant advantage for purposes of the second stage: they are entitled to a presumption that the employer had discriminated against them.

Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1106 (10th Cir. 2001)(citations, brackets and internal quotation marks omitted).

The plaintiff in a pattern-or-practice action is the Government, and its initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers. At the initial 'liability' stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating

that the Government's proof is either inaccurate or insignificant....

If an employer fails to rebut the inference that arises from the Government's prima facie case, a trial court may then conclude that a violation has occurred and determine the appropriate remedy. Without any further evidence from the Government, a court's finding of a pattern or pra

Teamsters, 431 U.S. at 360-61 (internal citation omitted).

"[I]n determining pattern or practice liability, the government is not required to prove that any particular employee was a victim of the pattern or practice; it need only establish a prima facie case that such a policy existed." E.E.O.C. v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1287 (11th Cir. 2000).

Once this pattern or practice is established, the burden of proof then shifts to the employer to demonstrate that the government's showing of a pattern or practice of discrimination is either inaccurate or insignificant. If the employer fails to rebut the government's prima facie case, the resulting finding of a discriminatory pattern or practice may give rise to an inference that all persons subject to the policy were its victims and are entitled to appropriate remedies... [O]nce a pattern and practice of discrimination is established, a rebuttable presumption that the plaintiff was discriminated against because of her

sex is entitled to recovery obtains. The employer may overcome this presumption only with clear and convincing evidence that job decisions made when the discriminatory policy was in force were not made in pursuit of that policy.

Joe's Stone Crab, 220 F.3d at 1287 (citation and internal quotation marks omitted).

As previously noted, awards which are to be tailored to the damages of the individual protected members will be determined at a subsequent stage of the proceedings. "When the Government seeks individual relief for the victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief... [A]s is typical of Title VII pattern-or-practice suits, the question of individual relief does not arise until it has been proved that the employer has followed an employment policy of unlawful discrimination. The force of that proof does not dissipate at the remedial stage of the trial." Teamsters, 431 U.S. at 361-62. "The second stage of a pattern and practice claim is essentially a series of individual lawsuits, except that there is a shift of the burden of proof in the plaintiff's favor." Thiessen, 267 F.3d at 1106 n.7 (citation and internal quotation marks omitted).

Thus, it is clear that the evidentiary approach used in pattern or practice cases varies substantially from that applied to individual suits.

> Pattern-or-practice cases differ significantly from the far more common cases involving one or more claims of individualized discrimination. In a case involving individual claims of discrimination, the focus is on the reason(s) for the particular employment decisions at issue... In contrast, the initial focus in a pattern-or-practice case is not on individual employment decisions but on a pattern of discriminatory decisionmaking. Thus, the order and allocation of proof, as well as the overall nature of the trial proceedings, in a pattern-or-practice case differ dramatically from a case involving only individual claims of discrimination.

*Id.* at 1106 (citations, brackets and internal quotation marks omitted).

"The typical pattern or practice discrimination case is brought either by the government or as a class action to establish that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers." Celestine, 266 F.3d at 355 (citation and internal quotation marks omitted). "In such cases, the focus, at least initially, is upon a pattern of discriminatory decision-making, i.e., the company's standard

operating procedure, rather than upon individual employment decisions." Herendeen v. Michigan State Police, 39 F.Supp.2d 899, 905 (D. Mich. 1999) (citation and internal quotation marks omitted).

"The crucial difference between an individual's claim of discrimination and a class action alleging general pattern or practice of discrimination is manifest. The inquiry regarding an individual's claim is the reason for a particular employment decision, while at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking." Celestine, 266 F.3d at 355.

The Supreme Court has yet to extend the pattern or practice approach to private, non-class suits. However, because of its particular nature we find application of this evidentiary method to actions brought by individual plaintiffs seeking personal relief in individual claims of disparate treatment unsuitable. Multiple courts have similarly concluded. *See, i.e.*, Bacon v. Honda of Am. Mfg., Inc., 370 F.3d 565, 575 (6th Cir. 2004) ("We therefore hold that the pattern-or-practice method of proving discrimination is not available to individual plaintiffs. We subscribe to the rationale that a pattern-or-practice claim is focused on establishing a policy of discrimination; because it does not address individual hiring decisions, it is inappropriate as a vehicle for proving discrimination in an individual case"); Celestine, 366 F.3d at 356

("As the plaintiffs are before us in their individual capacities...
the *Teamsters* method is not available to them"); <u>Thiessen</u>, 267 F.3d
at 1106 n.8 ("If the plaintiffs do not prevail during the first stage
of a pattern-or-practice trial, they are nevertheless entitled to
proceed on their individual claims of discrimination... Naturally,
however, they are left to proceed under the normal *McDonnell Douglas*
framework, rather than benefitting from a presumption of
discrimination"); <u>Brown v. Coach Stores, Inc.</u>, 163 F.3d 706, 711 (2nd
Cir. 1998) ("[I]t is evident that the Court in *Teamsters* was not
laying down rules for private, non-class actions. Of the cases cited
by the Court for the proposition that non-applicants can recover,
none were private non-class actions" (citation and internal quotation
marks omitted)); <u>Lowery v. Circuit City Stores, Inc.</u>, 158 F.3d 742,
761 (4th Cir. 1998) ("because the Supreme Court has never applied the
*Teamsters* method of proof in a private, non-class action for
employment discrimination, and because the nature of the proof and
remedies in class and government pattern or practice actions differs
vis-a-vis private, non-class actions, we decline to give individual
plaintiffs a pattern or practice cause of action or allow them to use
the *Teamsters* method of proof"); <u>Babrocky v. Jewel Food Co.</u>, 773 F.2d
857, 866 n.6 (7th Cir. 1985) ("Plaintiffs' use of 'pattern-or-
practice' language also seems to be misplaced, since such suits by
their very nature, involve claims of classwide discrimination and the
five plaintiffs, while attacking policies that would have affected

all of [defendant's] women employees as a class, have stated only their individual claims, not a class action" (citation and internal quotation marks omitted)); <u>Murphy v. Price Waterhouse Coopers, LLP</u>, 357 F.Supp. 230, 246 (D.D.C. 2004) ("[Defendant'] first challenge to the plaintiffs' 'pattern and practice' claim is that they may not proceed on this theory in an individual action for discrimination. The Court agrees"); <u>Herendeen</u>, 39 F.Supp.2d at 906 (declining to apply pattern or practice evidentiary proof method to individual discrimination claims). *See also*, <u>Jones v. U.P.S., Inc.</u>, 502 F.3d 1176, 1188 n.5 (10th Cir. 2007) (declining to "decide whether the pattern-or-practice method of proof is available to individual plaintiffs" but acknowledging "that other circuits have held that this method of proof is not available in a private, non-class suit.")

We therefore hold that plaintiff in this action does not have available the pattern or practice vehicle to prove her individual discrimination claim.[4] Accordingly, plaintiff's discrimination claim based on pattern or practice is hereby **DISMISSED**.

_____

[4] These past events may, however, depending on the particular circumstances, be used as additional evidence to meet plaintiff's *McDonnell Douglas* burden. *See*, <u>Lowery</u>, 158 F.3d at 761 ("[e]vidence of a pattern or practice of discrimination may very well be useful and relevant to prove the fourth element of a *prima facie* case... or to establish the plaintiff's ultimate burden"); <u>Murphy</u>, 357 F.Supp.2d at 247 ("notwithstanding the unavailability of a 'pattern and practice' theory, the plaintiffs may still use evidence of systematic or general discrimination in establishing their individual discrimination claims.")

### IV. SUMMARY JUDGMENT STANDARD

Rule 56(c) Fed. R. Civ. P., which sets forth the standard for ruling on summary judgment motions, in pertinent part provides that they shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Sands v. Ridefilm Corp., 212 F.3d 657, 660-61 (1st Cir. 2000); Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997). A genuine issue exists if there is sufficient evidence supporting the claimed factual disputes to require a trial. Morris v. Gov't Dev. Bank of Puerto Rico, 27 F.3d 746, 748 (1st Cir. 1994); LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994). A fact is material if it might affect the outcome of a lawsuit under the governing law. Morrissey v. Boston Five Cents Sav. Bank, 54 F.3d 27, 31 (1st Cir. 1995).

"In ruling on a motion for summary judgment, the court must view 'the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor.'" Poulis-Minott v. Smith, 388 F.3d 354, 361 (1st Cir. 2004) (citing Barbour v.

Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir.1995)). "In marshaling the facts for this purpose we must draw all reasonable inferences in the light most favorable to the nonmovant. That does not mean, however, that we ought to draw *unreasonable* inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007) (internal citation omitted italics in original).

Credibility issues fall outside the scope of summary judgment. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). *See also*, Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 432 (1st Cir. 2000) ("court should not engage in credibility assessments."); Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 49 (1st Cir. 1999) ("credibility determinations are for the factfinder at trial, not for the court at summary judgment."); Perez-Trujillo v. Volvo Car Corp., 137 F.3d 50, 54 (1st Cir. 1998) (credibility issues not proper on summary judgment); Molina Quintero v. Caribe G.E. Power Breakers, Inc., 234 F.Supp.2d 108, 113 (D.P.R. 2002). "There is no room for credibility determinations, no room for the measured weighing of conflicting

evidence such as the trial process entails, and no room for the judge to superimpose his own ideas of probability and likelihood. In fact, only if the record, viewed in this manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." <u>Cruz-Baez v. Negron-Irizarry</u>, 360 F.Supp.2d 326, 332 (D.P.R. 2005) (internal citations, brackets and quotation marks omitted).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 256-257, 106 S.Ct. 2505, 91 L.Ed.2d 202; <u>Navarro v. Pfizer Corp.</u>, 261 F.3d 90, 94 (1st Cir. 2000); <u>Grant's Dairy v. Comm'r of Maine Dep't of Agric.</u>, 232 F.3d 8, 14 (1st Cir. 2000), and cannot rely upon "conclusory allegations, improbable inferences, and unsupported speculation". <u>Lopez-Carrasquillo v. Rubianes</u>, 230 F.3d 409, 412 (1st Cir. 2000); <u>Maldonado-Denis v. Castillo-Rodríguez</u>, 23 F.3d 576, 581 (1st Cir. 1994); <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).

### V. LOCAL RULE 56(c)

Motions for summary judgment must comport with the provisions of Local Rule 56(c) which, in pertinent part, reads:

A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall

admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain in a separate section additional facts, set forth in separate numbered paragraphs and supported by a record citation as required by subsection (e) of this rule.

This provision specifically requires that in its own statement of material fact respondent either admit, deny, or qualify each of movant's proffered uncontested facts and for each denied or qualified statement cite the specific part of the record which supports its denial or qualification. Respondent must prepare its separate statement much in the same manner as when answering the complaint.

The purpose behind the local rule is to allow the court to examine each of the movant's proposed uncontested facts and ascertain whether or not there is adequate evidence to render it uncontested. "This 'anti-ferret' rule aims to make the parties organize the evidence rather than leaving the burden upon the district judge." Alsina-Ortiz v. Laboy, 400 F.3d 77, 80 (1st Cir. 2005). "The purpose of this 'anti-ferret rule' is to require the parties to focus the district court's attention on what is, and what is not, genuinely controverted. Otherwise, the parties would improperly shift the burden of organizing the evidence presented in a given case to the

district court." <u>Mariani-Colon v. Dep't of Homeland Sec.</u>, 511 F.3d 216, 219 (1st Cir. 2007) (internal citations omitted). *See also*, <u>Morales v. A.C. Orssleff's EFTF</u>, 246 F.3d 32, 33 (1st Cir. 2001) (summary judgment should not "impose [upon the court] the daunting burden of seeking a needle in a haystack"); <u>Leon v. Sanchez-Bermudez</u>, 332 F.Supp.2d 407, 415 (D.P.R. 2004).

"When complied with, they serve to dispel the smokescreen behind which litigants with marginal or unwinnable cases often seek to hide and greatly reduce the possibility that the district would will fall victim to an ambush." <u>Caban Hernandez</u>, 486 F.3d at 7 (citation, internal quotation marks and brackets omitted).

Apart from the fact that Local Rule 56(e) itself provides that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted" in discussing Local Rule 311.12, its predecessor, the First Circuit Court of Appeals stressed the importance of compliance by stating that the parties who ignore its strictures run the risk of the court deeming the facts presented in the movant's statement of fact admitted. "Given the vital purpose that such rules serve, litigants ignore them at their peril. In the event that a party opposing summary judgment fails to act in accordance with the rigors that such a rule imposes, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." *Id*. *See also*, <u>Alsina-</u>

<u>Laboy</u>, 400 F.3d at 80 ("Where the party opposing summary judgment fails to comply, the rule permits the district court to treat the moving party's statement of facts as uncontested"); <u>Cosme-Rosado v. Serrano-Rodriguez</u>, 360 F.3d 42, 46 (1st Cir. 2004) ("uncontested" facts pleaded by movant deemed admitted due to respondent's failure to properly submit statement of contested facts.)

"[A]bsent such rules, summary judgment practice could too easily become a game of cat-and-mouse, giving rise to the 'specter of district court judgment being unfairly sandbagged by unadvertised factual issues.'" <u>Ruiz-Rivera v. Riley</u>, 209 F.3d 24, 28 (1st Cir. 2000) (citing <u>Stepanischen v. Merchants Despatch Transp. Corp.</u>, 722 F.2d 922, 931 (1st Cir. 1983)).

Providing an alternative statement of facts without addressing the movant's factual proposals individually does not conform to the Local Rule's mandate and will cause defendant's proffered facts to be deemed uncontested. <u>Mariani-Colon</u>, 511 F.3d at 219. Further, denials without more are ineffective. Rather, the opposing party "must offer specific facts to counter those set out by [defendant]. [N]onmovant's facts must demonstrate the existence of definite competent evidence fortifying plaintiff's version of the truth. This is the case even where motive and intent are at issue. [Plaintiff] may not meet his burden by citing an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus." <u>Arroyo-Audifred v. Verizon Wireless, Inc.</u>,

527 F.3d 215, 219-20 (1st Cir. 2008) (internal citations and quotation marks omitted).

A party's failure to abide by the strictures of Local Rule 56(c), however, does not automatically entitle movant to summary judgment as requested. "It mainly means that the district judge can accept the moving party's allegedly uncontested facts as true, but whether or not this justifies summary judgment for the moving party depends upon the legal and factual configuration that results." Caban Hernandez, 486 F.3d at 8.

In the case before us, plaintiff only raised objections as to part of MARRIOTT's Statement of Uncontested Facts. Accordingly, we shall consider those facts not objected to as uncontested.[5] Further, we shall also deem as uncontested those facts adequately proffered by defendants which were not properly objected to by plaintiff.[6]

Additionally, plaintiff failed to submit her own proffered uncontested facts. Rather, in her response plaintiff included a section entitled "Additional Material Facts" which reads as follows:

> The Plaintiff does hereby incorporate and makes a part hereof her **entire Sworn Statement** under Penalty of Perjury pursuant to 28 USC Section 1746, hereto included as

---

[5] Specifically, plaintiff did not oppose ¶¶ 46-137 of MARRIOTT's Statement of Uncontested Facts (docket No. 82-3) pertaining to her retaliation claim.

[6] See Order in the Matter of Motion to Deem as Uncontested Defendant's Statement of Uncontested Facts issued on this date.

Exhibit 9, **as additional facts supported by her testimony as facts material to her opposition to the Defendant's Motion for Summary Judgment.**

Plaintiff's Reply to Defendant's Statement of Purported Uncontested Material Facts (docket No. 92) p.7 (emphasis ours).

In other words, rather than itemizing each proffered fact separately with reference to its particular evidentiary source as the Local Rule requires which would then allow defendant the opportunity to address them individually, plaintiff would have us extrapolate material facts to the controversy at hand from her sworn statement. This is precisely what this provision seeks to avoid.

Accordingly, we need not consider plaintiff's declaration as a substitute for the Local Rule 56(c) requirements.

### VI. PLAINTIFF'S UNSWORN STATEMENT

MARRIOTT has sought to exclude plaintiff's Unsworn Statement arguing that it is self-serving and contradicts prior deposition testimony and was never previously disclosed as part of the discovery process. According to MARRIOTT, plaintiff's "attempt to contradict and supplement her own deposition testimony with a self-serving and recently created Unsworn Statement which is wholly inadmissible, inasmuch as it was not produced to defendant during the course of discovery, contradicts her prior deposition testimony, and states plaintiff's opinions without evidentiary support." Reply to Plaintiff's Motion (docket No. 105) p. 6.

Initially, we must note that the information contained in plaintiff's Unsworn Statement at ¶¶ 22 to 37 pertains to her retaliation claim. Inasmuch as defendants' proffered facts regarding the retaliation claim were deemed uncontested due to plaintiff's failure to address them in accordance with the provisions of Local Rule 56(c), we shall disregard this part of the Unsworn Statement.

## A. Discovery

Movants contend that plaintiff's failure to furnish copy of her statement during the discovery process contravenes Rule 26(a) Fed. R. Civ. P. However, this provision is limited to the initial disclosures of "individual[s] likely to have discoverable information... that the disclosing party may use to support its claims", documents in its possession which may be used to support its claims, computation of damages and insurance agreements.

The Unsworn Statement is nothing more than plaintiff's relation of her educational background, work experience, efforts to get promoted to the Pit Boss position and her eventual resignation interspersed by her subjective appreciation of the events which she alleges were motivated by discriminatory animus.

Accordingly, we find no information therein which would have been subject to the Rule 26(a) mandate.

## B. Recanting

"It is settled that '[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict

and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.'" Torres v. E.I. Dupont de Nemours & Co., 219 F.3d 13, 20 (1st Cir. 2000) (citing Colantouni v. Alfred Calgagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994)); Sailor Inc. F/V v. City of Rockland, 324 F.Supp.2d 197, 202 (D.Me. 2004).

[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." Cleveland v. Policy Mgt. Sys. Corp., 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999).

The timing of the recanting, i.e., in response to a summary judgment request, has been held crucial as well as whether or not a satisfactory explanation for the change in testimony has been provided. Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 110 (1st Cir. 2006); Colantuoni, 44 F.3d at 5. See, i.e., Torres, 219 F.3d at 20-21 ("post-summary judgment affidavit... does not indicate that there was any confusion at the time of [affiant's] deposition testimony... nor does it allege that the prior testimony was in error.")

With regard to MARRIOTT's recanting argument, defendants have failed to identify any specific questions posed during discovery with

the answers provided by plaintiff in order for the court to ascertain whether indeed they are contrary to her statement. In other words, MARRIOTT has not identified the "clear answers to unambiguous questions" asked by defendants during plaintiff's deposition which she is now reneging in order to create an issue of fact.[7] Absent this information, we cannot accept defendants' argument.

### C. Conclusory Statements

On the other hand, any testimony used in support of discriminatory motive in a motion for summary judgment setting must be admissible in evidence, i.e., based on personal knowledge and otherwise not contravening evidentiary principles. Rule 56(e) specifically mandates that affidavits submitted in conjunction with the summary judgment mechanism must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Hoffman v. Applicators Sales and Serv., Inc., 439 F.3d 9 16 (1st Cir. 2006); Nieves-Luciano v. Hernandez-Torres, 397 F.3d 1, 5 (1st Cir. 2005); Carmona v. Toledo, 215 F.3d 124, 131 (1st 2000). See also, Quiñones v. Buick, 436 F.3d 284, 290 (1st Cir. 2006) (affidavit inadmissible given plaintiff's failure to cite "supporting evidence to which he could testify in court"). Additionally, the document "must concern facts as opposed to

[7] Plaintiff has also correlated the portions of her deposition testimony with the pertinent paragraphs of her declaration and there does not seem to be any apparent inconsistency between the two.

conclusions, assumptions, or surmise", <u>Perez v. Volvo Car Corp.</u>, 247 F.3d 303, 316 (1st Cir. 2001), not conclusory allegations <u>Lopez-Carrasquillo v. Rubianes</u>, 230 F.3d at 414.

"To the extent that affidavits submitted in opposition to a motion for summary judgment merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge, they are insufficient. However, a party's own affidavit, containing relevant information of which he has firsthand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment." <u>Santiago v. Centennial</u>, 217 F.3d 46, 53 (1st Cir. 2000) (internal citations and quotation marks omitted).

Hence, with regard to ¶¶ 1 through 21, only those facts personally known to plaintiff as to which she could testify in court may be relied upon.  However, those portions of plaintiff's statement which merely embellish facts and provide her subjective characterization of the circumstances leading to her employment with MARRIOTT and her perception of the alleged discriminatory reasons purportedly forcing her resignation are inappropriate under the confines of Rule 56(e).

## VII. TITLE VII - DISCRIMINATION

"When... direct evidence is lacking to support a discrimination claim, the plaintiff must rely on establishing a prima facie case through the familiar steps of the [*McDonnel Douglas*] burden-shifting

framework." Moron-Barradas v. Dep't of Educ., 488 F.3d 472, 480 (1st Cir. 2007). "[T]he burden for establishing a prima facie case is not onerous." Douglas v. J.C. Penney Co., Inc., 474 F.3d 10, 14 (1st Cir. 2007).

"Disparate treatment cases ordinarily proceed under the three-step, burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of discrimination. Second, if the plaintiff makes out this prima facie case, the defendant must articulate a legitimate, nondiscriminatory explanation for its actions. Third, if the defendant carries this burden of production, the plaintiff must prove by a preponderance that the defendant's explanation is a pretext for unlawful discrimination. The burden of persuasion remains at all times with the plaintiff." Mariani-Colon, 511 F.3d at 221 (citation and internal quotation marks omitted); Douglas, 474 F.3d at 14.

"Generally, a plaintiff establishes a prima facie case of discrimination by showing: 1) he is a member of a protected class, 2) he is qualified for the job, 3) the employer took an adverse employment action against him, and 4) the position remained open, or was filled by a person with similar qualifications. This burden is not onerous, as only a small showing is required." Mariani-Colon, 511 F.3d at 221-22 (citation and internal quotation marks omitted);

_Douglas_, 474 F.3d at 13-14. *See also*, <u>Moron-Barradas</u>, 488 F.3d at 481 (prima facie case established by presenting evidence that (1) plaintiff was "a member of a protected class, (2) she applied and was qualified for the... position, and... (3) was rejected... and (4) [defendant] hired someone with similar or lesser qualifications").

Once plaintiff has complied with this initial prima facie burden the defendant must "articulate a legitimate nondiscriminatory reason" for the challenged conduct at which time presumption of discrimination fades and the burden then falls back on plaintiff who must then demonstrate that the proffered reason was a "pretext" and that the decision at issue was instead motivated by discriminatory animus. <u>Rivera-Aponte v. Rest. Metropol #3, Inc.</u>, 338 F.3d 9, 11 (1st Cir. 2003); <u>Gu v. Boston Police Dept.</u>, 312 F.3d 6, 11 (1st Cir. 2002); <u>Gonzalez v. El Dia, Inc.</u>, 304 F.3d at 69; <u>Zapata-Matos v. Reckitt & Colman, Inc.</u>, 277 F.3d 40, 44-45 (1st Cir. 2002); <u>Feliciano v. El Conquistador</u>, 218 F.3d 1, 5 (1st Cir. 2000); <u>Santiago-Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d. 46, 54 (1st Cir. 2000). "At this third step in the burden-shifting analysis, the *McDonnell Douglas* framework falls by the wayside because the plaintiff's burden of producing evidence to rebut the employer's stated reason for its employment action merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." <u>Feliciano</u>, 218 F.3d at 6 (citing <u>Texas Dept. of Community Affairs v.</u>

Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981))
(internal citations and quotation marks omitted).

Defendant's "burden is one of production, not persuasion"
Reeves, 530 U.S. at 142, and "[a]t all times, the plaintiff bears the
'ultimate burden of persuading the trier of fact that the defendant
intentionally discriminated against the plaintiff.'" Gu v. Boston
Police Dept., 312 F.3d at 11 (citing Texas Dept. of Cmty. Affairs v.
Burdine, 450 U.S. at 253). See also, Reeves, 530 U.S. at 143.

"Upon the emergence of such an explanation, it falls to the
plaintiff to show both that the employer's proffered reasons is a
sham, and that discriminatory animus sparked its actions." Cruz-Ramos
v. Puerto Rico Sun Oil Co., 202 F.3d 381, 384 (1st Cir. 2000)
(citation and internal quotation marks omitted). "The plaintiff must
then show, without resort to the presumption created by the prima
facie case, that the employer's explanation is a pretext for...
discrimination." Rivera-Aponte v. Rest. Metropol # 3, Inc., 338 F.3d
at 11.

Thus, in a summary judgment context the court must determine
"whether plaintiff has produced sufficient evidence that he was
discriminated against due to his [age] to raise a genuine issue of
material fact." Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d at
45; Rivas Rosado v. Radio Shack, Inc., 312 F.3d 532, 534 (1st Cir.
2002). Summary judgment will be denied if once the court has reviewed
the evidence submitted by the parties in the light most favorable to

the plaintiff it finds there is sufficient evidence from which a trier of fact could conclude that the reasons adduced for the charged conduct are pretextual and that the true motive was discriminatory. Santiago-Ramos v. Centennial, 217 F.3d at 57; Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15. 20 (1st Cir. 1999).

Strict adherence to the *McDonnell Douglas* procedural paradigm is not imperative when ruling on a summary judgment. "'[A] court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a factfinder as to pretext and discriminatory animus.'" Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004) (citing Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535-36 (1st Cir. 1996)).

However, in the context of a summary judgment "'the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a factfinder as to pretext and discriminatory animus.'" Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d at 26 (citing Fennell v. First Step Designs, Ltd., 83 F.3d at 535).

"Proof of more than [plaintiff's] subjective belief that he was the target of discrimination however, is required. In order to establish a disparate treatment claim, a plaintiff must show that

CIVIL NO. 05-2108 (RLA)                                         **Page 34**

others similarly situated to him in all relevant respects were treated differently by the employer." Mariani-Colon, 511 F.3d at 222 (citations and internal quotation marks omitted).

"To survive a defendant's motion for summary judgment on a discrimination claim, a plaintiff must produce sufficient evidence to create a genuine issue of fact as to two points: 1) the employers' articulated reasons for its adverse actions were pretextual, and 2) the real reason for the employers' actions was discriminatory animus based on a protected category." Id. at 223.

"At the third stage of the McDonnell Douglas/Burdine framework, the ultimate burden is on the plaintiff to persuade the trier of fact that she has been treated differently because of her [sex]." Thomas v. Eastman Kodak co., 183 F.3d 38, 56 (1st Cir. 1999). "Plaintiff may use the same evidence to support both conclusions [pretext and discriminatory animus], provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." Thomas, 183 F.3d at 57 (citation and internal quotation marks omitted).

### A. Proffered Facts Relevant to the Selection Process

We find the following facts, proffered by defendants in their Statement of Uncontested Facts (docket No. 82-2) and which are relevant to the selection process for the Pit Boss position in March 2004, are uncontested.

CIVIL NO. 05-2108 (RLA)                                           Page 35

## 1. Background

The following individuals, currently employed by MARRIOTT, were somehow connected to the allegations charged in the complaint:

STUART LEVENE          -    Casino Director since 2003.

CARLOS OTERO           -    Casino Manager since mid 1998.

NESTOR DEL VALLE       -    Manager, Casino Slots Department since 2001-2002.

HECTOR MALDONADO       -    Casino Slots Department Assistant Manager since 2003-2004.

LUIS MARIA ACUÑA       -    Human Resources Director since July 2002.

ELIZABETH ARVELO       -    Director of Personnel Services since 2004.

PEDRO RIVERA           -    Area Director of Loss Prevention and Casino Surveillance for Latin-America and the Caribbean since 1999.

GLADYS RODRIGUEZ       -    Casino Floor Supervisor.

VENTURA ACOSTA, MIGUEL MALDONADO FONTAN, LUIS GUEVARA, JULIO VAZQUEZ and NORBERTO SANTIAGO have been Pit Bosses at the MARRIOTT's Casino since at least March 2004.

Plaintiff, MARIA VELEZ, commenced working at Marriott on December 6, 1994, as a Casino Floor Supervisor. From 1995 to 1999 she applied on three separate occasions to a Pit Boss position in the Casino but was never selected.

In March 2004 plaintiff again applied for a Pit Boss vacant position but WILFREDO GUZMAN was chosen instead.

### 2. March 2004 Pit Boss Vacancy

Late 2003 Casino management decided to open its table games operation twenty four hours a day starting in December 2003, for a trial period of three months. As a result thereof, the need arose for a new Pit Boss to work the newly-created shift, from 4:00 a.m. until 12:00 noon.

The selection for the position was made by a committee composed by the five Pit Bosses,[8] the Casino Director[9] and the Casino Manager.[10] GLADYS RODRIGUEZ, Casino Floor Supervisor, was also present during the selection meeting, but did not take part in the decision.

The selection process consisted of individual evaluations by each of the Pit Bosses, the Casino Manager and the Casino Director, using a form which contained the names of the candidates under consideration and the attributes required for the position. The individual committee members scored each candidate on each category. Thereafter, the decision makers conferred and reached a consensus as to the selected candidate.

---

[8]   NORBERTO SANTIAGO, VENTURA ACOSTA, MIGUEL MALDONADO, LUIS GUEVARA and JULIO VAZQUEZ.

[9]   CARLOS OTERO.

[10]   STUART LEVENE.

**CIVIL NO. 05-2108 (RLA)**                                          **Page 37**

The Pit Boss selected for the new shift would be responsible for the entire Casino operation during that shift. Therefore, the Casino management decided to give the opportunity to three supervisors to perform the duties of a Pit Boss during one month each, to see if one of them demonstrated the qualifications as the right candidate for the permanent position.

LUZ MEDINA, EDWIN CABRERA and LUIS FUENTES were chosen for this trial opportunity. However, none of them performed as expected and in March 2004 an opening for the Pit boss position was again published to consider additional candidates.

This time the decision makers considered plaintiff and WILFREDO GUZMAN as the two top candidates. GUZMAN was eventually selected over plaintiff.

### B. Additional Facts

We find the following additional facts relevant to the selection process uncontroverted for purposes of the summary judgment now before us based on the evidence on record.

### 1. The Selection Process

LEVENE's role during the selection meeting was that of a facilitator. "I'm listening. I'm sort of facilitating the meeting. I'm not passing judgment on anyone, because I did not or never had an opportunity to work very closely with any of them. But I'm just facilitating the process to try to make sure that, you know, that

people are being candid and fair." LEVENE Depo. Tr. 46 (docket No. 82-17).

Each member would be handed a scoring sheet to fill out and the individual results for each candidate would be added up. LUIS GUEVARA Depo. Tr. 61 (docket No. 82-19); CARLOS OTERO Depo. Tr. 48 (docket No. 82-18). "[E]verybody was given an opportunity to rank, or rate, or somehow figure out how they stacked-up against each other, and that was done individually. So everyone went to a cubicle or an office and filled out the form." LEVENE Depo. Tr. 42 (docket No. 82-17).

After each committee member had assessed the individual applicants independently of each other using the form they had been provided for this purpose, they met to discuss the candidates. "[E]verybody stood up and vocalized their thoughts, and we discussed the candidates." LEVENE Depo. Tr. 44 (docket No. 82-17). Once the scores were added up, the "weaknesses and strengths of each [candidate], aside from the ones that were there as guidelines [were discussed]." NORBERTO SANTIAGO Depo. Tr. 50 (docket No. 100-3). "Later on, we got together in a group to discuss what each one had... stated as opinion." CARLOS OTERO Depo. Tr. 48 (docket No. 82-18).

However, according to the decision makers, getting the highest scores in the individual evaluation forms was not conclusive. "[It] does not mean that automatically he is going to be chosen." NORBERTO SANTIAGO Depo. Tr. 48 (docket No. 100-3).

The decision makers considered plaintiff and WILFREDO GUZMAN as the two top candidates for the position. WILFREDO GUZMAN was eventually selected over plaintiff. "Wilfredo Guzman and Maria... were the top two (2) candidates." LEVENE Depo. Tr. 45 (docket No. 82-17). The results for Wilfredo Guzman, Maria Velez and Luis Fuentes were "close". CARLOS OTERO Depo. Tr. 53-54 (docket No. 82-18). "[T]he first candidates were Wilfredo Guzman, Maria Velez and I don't recall who was third, because it was practically the two of them who had the most points, Wilfredo Guzman and Maria Velez." CARLOS OTERO Depo. Tr. 54 (docket No. 82-18). WILFREDO and MARIA VELEZ were the final candidates. LUIS GUEVARA Depo. Tr. 63 (docket No. 82-19).

Because the two finalists were so close the committee went on to discuss the strong points and weaknesses of each one of them. CARLOS OTERO Depo. Tr. 57 (docket No. 100-9). "It was an open discussion, they were verifying who were [sic] going to be rejected... in accordance to the ones who were closer or had a higher score... they began to talk about strong points and weaknesses that each one of them had." CARLOS OTERO Depo. Tr. 54 (docket No. 82-18). After the two final candidates were chosen, "[t]here was discussion as to what is the person they were looking for, what was being looked for... in a pit boss; and they discussed problems that had... that had arisen; they discussed... well, the pros and the cons of each one." LUIS GUEVARA Depo. Tr. 63 (docket No. 82-19).

According to LEVENE, "Wilfredo was selected because of the five (5) candidates we thought that he was the most qualified." LEVENE Depo. Tr. 42 (docket No. 82-17). "[T]here were several considerations... table games knowledge... work experience... attitude, associate relations, customer relations, team work." LEVENE Depo. Tr. 42 (docket No. 82-17).

When inquired regarding the reasons for having selected WILFREDO over plaintiff, LEVENE responded: "I think a lot of positive things were said about both candidates. I think that they were both good... And I believe that Wilfredo may have inched-out Maria on the basis of team work and team chemistry and customer relations and associate relations." LEVENE Depo. Tr. 45 (docket No. 82-17). However, LEVENE could not "recall the specifics" regarding the committee members' concerns in these areas.  LEVENE Depo. Tr. 46 (docket No. 82-17).

WILFREDO GUZMAN's strong points were: "[h]e had knowledge of the game... he had good rapport with the associates. He had good teamwork, and he treated clients very well." CARLOS OTERO Depo. Tr. 55 (docket No. 82-18). "[H]e was a person who had very good relations with all the associates, including supervisors, including coworkers, associates and superiors. That he is a person who also gets along excellently with the players, with the clients; that, as far as I am concerned, is an area that was one of the most important ones." LUIS GUEVARA Depo. Tr. 67 (docket No. 82-19).

As to his weaknesses, "he worked more in the work shift during the daytime, and maybe did not have the... in other words, that there as [sic] many games going on at night as such... In other words, maybe he was not accustomed to so many games." CARLOS OTERO Depo. Tr. 55 (docket No. 82-18). Additionally, he did not know the roulette game. LUIS GUEVARA Depo. Tr. 66 (docket No. 82-19).

The issue of a "warning" issued to WILFREDO GUZMAN a year before due to the untimely renewal of his licence also came up but the warning had expired. LUIS GUEVARA Depo. Tr. 66 (docket No. 100-7). WILFREDO GUZMAN was given a warning by JULIO VAZQUEZ for having failed to timely renew his "croupier's" licence because of problems with ASUME.[11] WILFREDO GUZMAN Depo. Tr. 48-51 (docket No. 100-4).

As to MARIA, "[h]er strong points [were], knowledge of the games, knowledge of the slot machine area... and experience, those were her strong points." CARLOS OTERO Depo. Tr. 55 (docket No. 82-18). "[S]he knew all the games... had more experience... than Wilfredo Guzman." LUIS GUEVARA Depo. Tr. 66-67 (docket No. 82-19). "[She] knew the games, she had experience". JULIO VAZQUEZ Depo. Tr. 42 (docket No. 82-20).

Regarding plaintiff's weak points as a candidate, LEVENE indicated that "[he] didn't have any team work issues with any of

---

[11] State agency responsible for procuring child support for minors.

[the candidates] but the people who knew them best, obviously, had some concerns". LEVENE Depo. Tr. 46 (docket No. 82-17).

"Her weaknesses turn out to be teamwork, how to deal with the clients..." CARLOS OTERO Depo. Tr. 55 (docket No. 82-18). "I always remember that there had been two or three clients who had complained about [plaintiff], because [plaintiff] was not... she was very rough, rough with them, in other words, very explosive." JULIO VAZQUEZ Depo. Tr. 46 (docket No. 82-20).

Q.   Okay. Any other negative instance of Maria that was discussed?

A.   [I]t was basically her attitude, her attitude as a supervisor toward... towards the associates, which was a bit... it ... it was an attitude, well... how could I say it... rough, or maybe, on occasions it could border on".

LUIS GUEVARA Depo. Tr. 65 (docket No. 82-19).

The committee members were also allegedly worried about "some incidents with some female employees who had accused [plaintiff] of... of her having threatened them because of talking to [plaintiff'] partner." JULIO VAZQUEZ Depo. Tr. 42 (docket No. 82-20). Specifically, JULIO VAZQUEZ indicated that a Pit Clerk by the name of JUDITH had complained that plaintiff had threatened her because plaintiff did not like her talking to MARIO CRUZ and that plaintiff had called JUDITH's husband to tell him that JUDITH was trying to

CIVIL NO. 05-2108 (RLA)                                                    Page 43

seduce MARIO. JULIO VAZQUEZ Depo. Tr. 43-44 (docket No. 82-20); LUIS
GUEVARA Depo. Tr. 64-65 (docket No. 82-19). Supposedly another Pit
Clerk named JANESA indicated that plaintiff had also called her
husband. JULIO VAZQUEZ Depo. Tr. 47 (docket No. 82-20).

Additionally, plaintiff had procured a protective order against
MARIO CRUZ, a coworker. JULIO VAZQUEZ Depo. Tr. 44 (docket No. 82-
20). "[T]he entire conversation revolved around Mario and Maria's
problem at work." JULIO VAZQUEZ Depo. Tr. 45 (docket No. 82-20).

Another factor discussed was the fact that plaintiff would be
supervising her partner if promoted to the pit boss position. Someone
present raised the matter during the discussion. LEVENE Depo. Tr. 48
(docket No. 82-17). This factor, although did not "disqualify her,
but [] was given weight" in the selection process. LEVENE Depo. Tr.
48 (docket No. 82-17).

According to the committee members, this was a matter of concern
due to a recent incident involving a theft at the casino by a couple
working together. CARLOS OTERO Depo. Tr. 81 (docket No. 82-18).

> Well, there was a situation that is rather sort of
> bizarre and unique unto itself that happened Tuesday.
> That's for sure, I remember exactly when it happened, and
> all hell broke loose. There was a little bit of a scam that
> involved the collusion between two (2) people: one was the
> Auditor and the other was the slot supervisor. And somehow
> they absconded with about a hundred and twenty thousand

CIVIL NO. 05-2108 (RLA)                                               **Page 44**

dollars ($120,000.00) And the Auditor was really the safety
net that was supposed to be double checking the paper work
and that was being erroneously processed. And we discovered
it, and eventually recovered the funds, but it just scared
the... You know, this was something that was so significant
the auditors got involved; the regional team got involved;
everybody had an opinion on everything from our procedures,
to relationships, to whatever, and that was a difficult
time.

LEVENE Depo. Tr. 47-48 (docket No. 82-17).

However, no measures were taken with regard to the couples who
were already working at the Casino. GLADYS RODRIGUEZ Depo. Tr. 49
(docket No. 82-21).

### 2. Non-discriminatory Reasons Proffered

Plaintiff's initial prima facie burden is easily met in this
suit and defendants have so conceded. "In this case Marriott is not
contesting plaintiff's *prima facie* case. That is, plaintiff is
obviously a female individual; she had acceptable performance
evaluations, and she was not granted a promotion she requested."
Memorandum of Law (docket No. 82) p. 5.

Thus, the burden falls upon the defendants to articulate a
legitimate nondiscriminatory reason for having selected WILFREDO
GUZMAN for the Pit Boss position over plaintiff.

CIVIL NO. 05-2108 (RLA)                                    **Page 45**

---

According to MARRIOTT, the selection committee opted for the male applicant "inasmuch as he had the required table games knowledge, experience, attitude, associate's relations, customer relations and teamwork." Memorandum of Law (docket No. 82) pp. 6-7. Even though "[p]laintiff was seriously considered for the position, as she had the table games knowledge and experience needed... Guzman outscored her in teamwork, team chemistry, customer's relations and associate's relations." Memorandum of Law (docket No. 82) p. 7.

MARRIOTT explains that its decision was not based on a single factor but rather "a combination of factors that weighed in favor of selecting Guzman over plaintiff, including attitude, associate and customer's relations skills (for example, plaintiff's incidents with co-workers and clients, such as a discussion with a female co-worker motivated by jealousy), teamwork, inability to keep the personal life outside the workplace, and the fact that, if awarded the position, plaintiff would supervise her then live-in partner." Reply (docket No. 105) at 14.

Defendants having come forth with legitimate nondiscriminatory reasons for having rejected plaintiff's promotion the evidentiary presumption of discrimination vanishes and the burden falls back upon plaintiff to demonstrate that the proffered grounds for her non-selection were a "pretext" and the decision was motivated instead by sex discrimination.

The fact that the reasons proffered by the employer are discredited by plaintiff does not automatically mandate a finding of discrimination. "That is because the ultimate question is not whether the explanation was false, but whether discrimination was the cause of the [conduct at issue]. We have adhered to a case by case weighing. Nonetheless, disbelief of the reason may, along with the prima facie case, on appropriate facts, permit the trier of fact to conclude the employer had discriminated." Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d at 45 (citations omitted); Reeves, 530 U.S. at 147-48. Plaintiff's challenges to defendant's proffered reasons is not sufficient to meet his burden. See, Ronda-Perez v. Banco Bilbao Vizcaya, 404 F.3d 42, 44 (1st Cir. 2005). Rather, "[t]he question to be resolved is whether the defendant's explanation of its conduct, together with any other evidence, could reasonably be seen by a jury not only to be false but to suggest an age-driven animus." Id. See also, Candelario Ramos v. Baxter Healthcare Corp. of P.R., 360 F.3d 53, 56 (1st Cir. 2004).

Plaintiff first contends that MARRIOTT failed to articulate a legitimate, non-discriminatory reason for the challenged selection process. In the alternative, she posits that there are genuine issues of material facts regarding defendants' articulated reasons for her non-selection which point to discriminatory animus.

We find that defendants have met their burden of advancing gender-free reasons for having selected WILFREDO GUZMAN over

plaintiff for the Pit Boss position sufficiently to shift the burden to plaintiff to establish that the reasons given were but a pretext for sex discrimination.

### 3. Pretext

In support of her pretext argument plaintiff initially contends that she is entitled to an evidentiary inference in her favor due to spoliation of relevant documents. Plaintiff contends that she is entitled to an inference that she was better qualified than her male counterpart for the vacant Pit Boss position in March of 2004 because the selection committee evaluations are no longer available.

### a.    Spoliation

GLADYS RODRIGUEZ testified in her deposition that she had been handed the documents used by the decision-makers for calculating the applicant's score at the conclusion of their meeting for safekeeping which she placed in a filing cabinet in her office. She further indicated that her office keys were misplaced and the documents were taken from her office. "Well, it was stolen, they took it. My key from the, from the, from my office was lost and, well, apparently they took it." GLADYS RODRIGUEZ Depo. Tr. 54 (docket No. 100-5).

According to plaintiff, the written evaluations forms filled out by the individual committee members during the selection process are critical to demonstrate the underlying discriminatory reasons for not having been selected over the male candidate because they have disappeared under unknown circumstances. "A reasonable inference

deriving from the non-production of the selection committee evaluations is that she outscored her male counterpart in her overall score particularly given the direct evidence that [plaintiff] was clearly the most experienced of the two final candidates." Plaintiff's Motion in Opposition (docket No. 92-2) p. 20 & Sur-reply (docket No. 120) p. 13.

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (1st Cir. 2001).

Litigants have the responsibility of ensuring that relevant evidence is protected from loss or destruction. "'A litigant has a duty to preserve relevant evidence.'" Perez-Velasco v. Suzuki Motor Co. Ltd., 266 F.Supp.2d 266, 268 (D.P.R. 2003) (citing Vazquez Corales v. Sea-Land Serv., Inc., 172 F.R.D. 10, 11-12 (D.P.R. 1997)).

Further, this obligation predates the filing of the complaint and arises once litigation is reasonably anticipated. The duty extends to giving notice if the evidence is in the hands of third-parties. "'The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation... If a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party

CIVIL NO. 05-2108 (RLA)                                          **Page 49**

notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence.'" Perez-Velasco, 266 F.Supp.2d at 268 (citing Silvestri, 271 F.3d at 591).

Relevant evidence is that which may prove or disprove a party's liability theory. Perez-Velasco; Vazquez Corales.

If the court finds that a party is accountable for the spoliation it may impose sanctions to avoid unfair prejudice to the opposing party. "'[T]he district court has inherent power to exclude evidence that has been improperly altered or damaged by a party where necessary to prevent the non-offending side from suffering unfair prejudice.'" Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 28 (1st Cir. 1998) (citing Sacramona v. Bridgestone/Firestone, Inc., 106 F.3d 444, 446 (1st Cir. 1997)); Silvestri, 271 F.3d at 590; Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 29, 28 (1st Cir. 1998).

Prejudice will be measured by the degree in which a party's ability to adequately develop its liability theory or mount a proper defense has been hampered. Perez-Velasco, 266 F.Supp.2d at 269; Driggin v. Am. Sec. Alarm Co., 141 F.Supp.2d 113, 121 (D.Me. 2000); Vazquez-Corales, 172 F.R.D. at 14.

"The intended goals behind excluding evidence, or at the extreme, dismissing a complaint, are to rectify any prejudice the non-offending party may have suffered as a result of the loss of the evidence and to deter any future conduct, particularly deliberate

CIVIL NO. 05-2108 (RLA)                                            **Page 50**

conduct, leading to such loss of evidence... Therefore, of particular importance when considering the appropriateness of sanctions is the prejudice to the non-offending party and the degree of fault of the offending party. Collazo-Santiago, 149 F.3d at 29. *See i.e.*, Silvestri, 271 F.3d at 594 ("even when conduct is less culpable, dismissal may be necessary if the prejudice to the defendant is extraordinary, denying it the ability to adequately defend its case"); Flury v. Daimler Chrysler Corp., 427 F.3d 939, 943 (1st Cir. 2005) ("[t]his case hinges upon the significance of the evidence destroyed and upon the extreme prejudice the defendant suffered as a result. Although the district court is afforded a considerable amount of discretion in imposing sanctions, we believe the extraordinary nature of plaintiff's actions coupled with extreme prejudice to the defendant warrants dismissal.")

Applicable caselaw in the First Circuit has clearly established that "bad faith or comparable bad motive" is not required for the court to exclude evidence in situations involving spoliation. Trull v. Volkswagen of America, Inc., 187 F.3d 88, 95 (1st Cir. 1999).

In addition to the severity of the prejudice suffered the court must also consider "whether the non-offending party bears any responsibility for the prejudice from which he suffers." Driggin, 141 F.Supp.2d at 121. "Fairness to the opposing party... plays a substantial role in determining the proper response to a spoliation motion, and punishment for egregious conduct is not the sole

CIVIL NO. 05-2108 (RLA)                                    **Page 51**

---

rationale for the most severe sanction of exclusion." <u>Trull</u>, 187 F.3d at 95.

Sanctions for spoliation range from dismissal of the action, exclusion of evidence or testimony or instructing the jury on a negative inference to spoliation whereby the jury may infer that a party who destroyed evidence did so out of realization that it was unfavorable. The measure of the appropriate sanctions will depend on the severity of the prejudice suffered. <u>Driggin</u>, 141 F.Supp.2d at 121; <u>Vazquez-Corales</u>, 172 F.R.D. at 13, 15.

It is not known at what particular point in time the evaluation forms disappeared. All we have before us is the deposition testimony of MS. RODRIGUEZ, in charge of their safekeeping, who indicated that "[t]he exact date [of their disappearance] as such I don't remember. I know that at a given moment, well, I needed the documents and when I went to look for them they were not, they were not there." GLADYS RODRIGUEZ Depo. Tr. 82 (docket No. 100-5).

Thus, it is difficult for the court to conclude that the timing of the disappearance coincided with the foreseeability of litigation which would have triggered defendants' duty to preserve these documents.

Further, because we find that plaintiff has available sufficient evidence to raise issues of material fact regarding the veracity of defendant's proffered reasons for its decision as well as an

inference of discriminatory animus we do not find that plaintiff has been unfairly prejudiced by their unavailability.

Accordingly, we reject plaintiff's spoliation argument.

**b. Subjective Factors**

It is evident from the testimony adduced by the parties that during the selection process the objective factors listed in the evaluation form were deemed less important than subjective ones. As a matter of fact, all the committee members coincided when they found that plaintiff was more experienced and more dexterous at the table games than WILFREDO. Accordingly, we shall focus our attention on whether the subjective reasons proffered by MARRIOTT for not selecting plaintiff can be deemed a subterfuge for sex discrimination.

We shall commence our review with the anecdotal stories surrounding plaintiff's personal life. Indeed, this particular subject took up a significant portion of the discussion during the selection process and also weighed heavily on the reasons advanced for plaintiff's non-selection to the Pit Boss position.

Defendants justify their choice of candidate and deny that the subjective evaluation factors were rumors but rather that these were real events either documented in plaintiff's personnel file or admitted by plaintiff during her deposition.

However, we must note that the events pertaining to plaintiff's life which were relied upon by defendants in support of their

selection process date from 1997 to 1998, that is, six years prior to the decision at issue in this litigation.[12] No evidence of more recent incidents has been submitted. Plaintiff's personal life seems to have seeped into the center of the decision-making process without specific notice of how it would impinge on her ability to do her job in 2004.

Plaintiff also challenges as disqualifying criteria the fact that she would supervise her then live-in partner if she were promoted to the Pit Boss position. It is undisputed that in March 2004 various Casino employees had ongoing relationships with other Casino employees[13] with no effect in their employment. According to CARLOS OTERO, nothing was done regarding couples who were already working at MARRIOTT. Rather, things continued as before. CARLOS OTERO Depo. Tr. 82 (docket No. 82-18).

As a matter of fact, CARLOS OTERO had a common law partner with a lesser rank at the Casino and depending on their shifts they

---

[12]   For example: Record of Conversation dated December 1, 1997, Memo from Gil Torres to plaintiff dated December 8, 1997, Record of Conversation dated January 24, 1998, and Record of Conversation dated January 25, 1998. Defendants' Motion for Summary Judgment... (docket No. 82) Exhs. 18-21. According to plaintiff, the restraining order was issued in 1999 but we have not seen any evidence confirming this date. See Plaintiff's Motion in Opposition (docket No. 92-2) p. 23-24.

[13] For example: DEREK LOPEZ and JOMARIE COLON, DORIS RODRIGUEZ and DANIEL CARRASQUILLO, GRISELL CASTILLO and CARLOS OTERO. GLADYS RODRIGUEZ Depo. Tr. 51 (docket No. 100-5); CARLOS OTERO Depo. Tr. 82 (docket No. 82-18).

coincided at work. This situation was never taken up with MR. OTERO even though he held the position of Casino Manager, the second in command in the Casino hierarchy. CARLOS OTERO Depo. Tr. 81 (docket No. 82-18).

There is no evidence on record of an extant policy at MARRIOTT during that period of time proscribing couples from working together at the Casino. Further, apart from the concern raised exclusively in plaintiff's situation no prospective measures were taken regarding employed couples to avoid possible embezzlements in the future.

Lastly, it is important to distinguish between the nature of the supervisory role played by a Pit Boss and a games employee with that of an auditor - the final check and balance in the Casino operation. According to LEVENE, the comptroller "[is] responsible for all finance/accounting/audits, the cage operations, [and] the cage cashiers". LEVENE Depo. Tr. 61 (docket No. 82-17).

For purposes of the summary judgment request presently before us "'the focus should be on the ultimate issue: whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact as to whether the termination of the plaintiff's employment was motivated by [sex] discrimination.'" Rivas Rosado v. Radio Shack, Inc., 312 F.3d 532, 535 (1st Cir. 2002) (citing Dominguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 430-31 (1st Cir. 2000)).

The candidate's personnel records, including their formal evaluations and/or negative entries for the previous years were not considered in the decision-making process.[14] Even though there were vague references as to plaintiff's difficulties with co-workers and instances of problems with clients,[15] the final selection hinged on subjective factors such as outdated anecdotal stories regarding plaintiff's personal life and unevenly applied criteria involving working couples used by a group composed exclusively by seven men - for MS. RODRIGUEZ was merely a witness to the process.

As to the alleged security concern, it seems illogical to consider a potential for defalcation due to plaintiff's personal relationship and not between someone much higher in the Casino organization and his partner. The fact that absolutely nothing was done regarding employees in similar personal conditions working at the Casino either at the time of the events involving this litigation

---

[14] LEVENE Depo. Tr. 52-53 (docket No. 88-4).

[15] With respect to plaintiff's relationship with clients JULIO VAZQUEZ stated that on two or three occasions clients had complained that plaintiff was "very rough", "very explosive". Yet there is no record of anything being done about this matter such as interviewing the clients and formally placing their complaints in plaintiff's personnel file. Under the circumstances it is for the trier of facts to determine what actions or comments of plaintiff would lead to the conclusion that she was "very rough" and "very explosive" other than affiant JULIO VAZQUEZ' subjective perception. With respect to plaintiff's attitude toward fellow workers, LUIS GUEVARA's vague statement is that it was "a bit... it... was an attitude, well.. how could I say it... rough, or maybe, on occasions it could border on haughtiness." LUIS GUEVARA Depo. Tr. 65-66 (docket No. 82-19).

CIVIL NO. 05-2108 (RLA)                                           Page 56

or prospectively, together with the other evidence available to the court raises the specter of sex based discrimination.[16]

Accordingly, we find that taking all inferences in plaintiff's favor, she has sufficiently raised issues of material fact to warrant denial of defendants' request to dismiss her sex discrimination claim based on her non-selection for the Pit Boss position in March 2004.

### VIII. TITLE VII - RETALIATION

#### A. Timeliness

Plaintiff also alleges that she suffered retaliation while employed at MARRIOTT in the form of a hostile work environment.

Plaintiff filed her initial discriminatory charge challenging defendants' failure to promote her to the Pit Boss position on March 26, 2004. The following year, on March 25, 2005, she submitted a retaliation charge.

Defendants argue that exhaustion of administrative remedies is mandated as to all allegedly retaliatory conduct asserted by plaintiff for which reason part of the events underlying plaintiff's retaliation claim, which were never presented to the pertinent agency for investigation, are time-barred.

---

[16] We reject plaintiff's proffer regarding WILFREDO's low scores in past evaluations, purported admonishments and discipline record as well as the allegedly late submission of his application for the Pit Boss position in March 2004 bypassing the Human Resources Office as unfounded. Further, defendants submitted WILFREDO's evaluations for the years 2002 through 2004 which refute this claim.

CIVIL NO. 05-2108 (RLA)                                    Page 57

Indeed, as previously noted, exhaustion of administrative remedies is an integral component of the Title VII legislative scheme. In Puerto Rico, an aggrieved employee has 300 days from the occurrence of the employment action complained of to file an administrative charge in instances where the local Department of Labor is empowered to provide relief, i.e., in instances of "deferral" jurisdiction. Bonilla, 194 F.3d at 278 n.4; Lebron-Rios v. U.S. Marshal Serv., 341 F.3d 7, 11 n.5 (1st Cir. 2003). Otherwise, the applicable period is 180 days. See, 42 U.S.C. § 2000e-5(e)(1).[17]

The Puerto Rico Anti-Discrimination Unit of the Department of Labor has no jurisdiction over Title VII retaliation claims and thus, is not deemed a Designated Agency under § 2000e-5(e)(1). Therefore, claims for retaliation must be filed with the EEOC within 180 days

---

[17] In pertinent part, § 2000e-5(e)(1) reads:

> A charge under this section shall be filed within **one hundred and eighty days** after the alleged unlawful employment practice occurred... except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a state or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto... such charge shall be filed by or on behalf of the person aggrieved within **three hundred days** after the alleged unlawful employment practice occurred.

(Emphasis ours).

CIVIL NO. 05-2108 (RLA)                                        Page 58

from the events complained of.[18] *See also*, <u>Alvarez v. Delta Airlines,</u> <u>Inc.,</u> 319 F.Supp.2d 240, 249 (D.P.R. 2004) ("The EEOC has not conferred the ADU in Puerto Rico with jurisdiction to hear claims for retaliation under section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a), such as the one presented by [plaintiff], which is an independent cause of action from his sexual harassment claims. *See* 29 C.F.R. § 1601.74. In such a case, a claimant will have 180 days, not 300 days, from the alleged unlawful employment practice to file a charge of retaliation under Title VII with the EEOC.")

However, the Court of Appeals for the First Circuit has held that the exhaustion requirement may prove inadequate in some instances and may be waived "so long as the retaliation is reasonably related to and grows out of the discrimination complained of to the agency - *e.g.*, the retaliation is for filing the agency complaint itself." <u>Clockedile v. New Hampshire Dep't of Corrections</u>, 245 F.3d 1, 6 (1st Cir. 2001).

Given the fact that the purportedly stale retaliatory events allegedly arose from plaintiff having filed her initial discriminatory claim with the ADU in March of 2004, we reject defendants' timeliness argument based on <u>Clockedile</u>.

---

[18]   The designation of Puerto Rico as a "deferral" state for Title VII violations specifically excludes retaliation claims asserted under Sec. 704(a), 42 U.S.C. § 2000e-3(a). *See*, 29 C.F.R. § 1601.74.

## B. Retaliation - The Law

Our review of the facts necessary to rule on the retaliation claim in this action is limited by plaintiff's failure to abide by the Local Rule 56(c) requirements.[19] Because plaintiff did not adequately challenge the underlying facts advanced by MARRIOTT in support of its request for dismissal of this particular cause of action, we shall examine defendants' proffered explanations for these events as uncontested.

"Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a), states that it is unlawful for an employer to discriminate against an employee because 'he has opposed any practice made an unlawful employment practice..., or because he has made a charge, testified, assisted, or participated in any matter in an investigation, proceeding, or hearing.'" DeClaire, 530 F.3d at 19.

The interests sought to be protected by Title VII's anti-discrimination mandate differ from those underlying its retaliation clause. "The substantive provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

---

[19] As previously noted, because plaintiff failed to address defendants' proffered facts ¶¶ 46-137 we shall deem them uncontested when addressing MARRIOTT's explanations surrounding these events.

"It therefore does not matter for retaliation purposes whether [the employer] would have treated a male [employee] the same way he treated [plaintiff]. The relevant question is whether [the employer] was retaliating against [plaintiff] for filing a complaint, not whether he was motivated by gender bias at the time." DeClaire, 530 F.3d at 19.

Hence, for retaliation purposes "[t]he relevant conduct is that which occurred *after* [plaintiff] complained about his superior's [discriminatory] related harassment." Quiles-Quiles v. Hendeson, 439 F.3d 1, 8 (1st Cir. 2006).

### C. Burden of Proof - McDonnel Douglas

"The evidence of retaliation can be direct or circumstantial." DeClaire, 530 F.3d at 20. Unless direct evidence is available, Title VII retaliation claims may be proven by using the burden-shifting framework set forth  down in McDonnell Douglas. "In order to establish a prima facie case of retaliation, a plaintiff must establish three elements. First, the plaintiff must show that he engaged in a protected activity. Second, the plaintiff must demonstrate he suffered a materially adverse action, which caused him harm, either inside or outside of the workplace. The impact of this harm must be sufficient to dissuade a reasonable worker from making or supporting a charge of discrimination. Third, the plaintiff must show that the adverse action taken against him was causally linked to his protected activity." Mariani-Colon, 511 F.3d at 223 (citations

and internal quotation marks omitted); <u>Moron-Barradas</u>, 488 F.3d at 481; <u>Quiles-Quiles</u>, 439 F.3d at 8.

"Under the *McDonnell Douglas* approach, an employee who carries her burden of coming forward with evidence establishing a prima facie case of retaliation creates a presumption of discrimination, shifting the burden to the employer to articulate a legitimate, non-discriminatory reason for the challenged actions... If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for the challenged actions was in fact a pretext for retaliating." <u>Billings v. Town of Grafton</u>, 515 F.3d 39, 55 (1st Cir. 2008) (citations, internal quotation marks and brackets omitted).

"[A]n employee engages in protected activity, for purposes of a Title VII retaliation claim, by opposing a practice made unlawful by Title VII, or by participating in any manner in an investigation or proceeding under Title VII." <u>Mariani-Colon</u>,511 F.3d at 224.

"[Title VII's] anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." <u>Burlington</u>, 548 U.S. at 67. In order to prevail on a retaliation claim "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 68. It

is not necessary that the conduct at issue affect the employee's "ultimate employment decisions." *Id.* at 67.

According to <u>Burlington</u>, the determination of whether a particular action is "materially adverse" must be examined based on the facts present in each case and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 71 (citation and internal quotation marks omitted).

In reaching its decision in <u>Burlington</u>, the Supreme Court considered factors such as the fact that the duties of a position "were... more arduous and dirtier" when compared to the other position which "required more qualifications, which is an indication of prestige [] and... was objectively considered a better job". *Id.* (citation and quotation marks omitted).

In <u>Billings</u> the court distinguished between minor incidents which take place in the usual course of a work setting and have no import on an individual's decision to file a discrimination charge and those which might deter an employee from complaining of such conduct. Specifically, the court noted that "some of [the supervisor's] behavior - upbraiding [plaintiff] for her question at the Board of Selectmen meeting, criticizing her by written memoranda, and allegedly becoming aloof toward her - amounts to the kind of petty slights or minor annoyances that often take place at work and that all employees experience and that, consequently, fall outside

the scope of the antidiscrimination laws... But we cannot say the same for the other incidents, namely, investigating and reprimanding [plaintiff] for opening the letter from [the supervisor's] attorney, charging her with personal time for attending her deposition in this case, and barring her from the Selectmen's Office. While these measures might not have made a dramatic impact on [plaintiff's] job, conduct need not relate to the terms or conditions of employment to give rise to a retaliation claim. Indeed, we think that these actions, by their nature, could well dissuade a reasonable employee from making or supporting a charge of discrimination. An employee who knows that, by doing so, she risks a formal investigation and reprimand - including a threat of further, more serious discipline - for being insufficiently careful in light of her pending litigation as well as the prospect of having to take personal time to respond to a notice of deposition issued by her employer in that litigation, might well choose not to proceed with the litigation in the first place." Billings, 515 F.3d at 54 (citations, internal quotation marks and brackets omitted).

"It is true that an employee's displeasure at a personnel action cannot, standing alone, render it materially adverse... [but plaintiff] came forward with enough objective evidence contrasting her former and current jobs to allow the jury to find a materially adverse employment action." Id. at 53.

Depending on the particular set of facts at hand, "temporal proximity alone can suffice to meet the relatively light burden of establishing a prima facie case of retaliation." DeClaire, 530 F.3d at 19 (citation and internal quotation marks omitted). *See also*, Mariani-Colon, 511 F.3d at 224 ("[T]he 'temporal proximity' between appellant's allegations of discrimination in June 2002 and his termination in August 2002 is sufficient to meet the relatively light burden of establishing a prima facie case of retaliation"); Quiles-Quiles, 439 F.3d at 8 ("[I]n proper circumstances, the causation element may be established by evidence that there was a temporal proximity between the behavior in question and the employee's complaint.")

"[T]here is no mechanical formula for finding pretext. One way to show pretext is through such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and with or without the additional evidence and inferences properly drawn therefrom infer that the employer did not act for the asserted non-discriminatory reasons." Billings, 515 F.3d at 55-56 (citations, internal quotation marks and brackets omitted).

Plaintiff carries the burden of presenting admissible evidence of retaliatory intent in response to a summary judgment request. The court need not consider unsupported suppositions. "While [plaintiff]

CIVIL NO. 05-2108 (RLA)                                              **Page 65**

engages in much speculation and conjecture, a plaintiff cannot defeat summary judgment by relying on conclusory allegations, or rank speculation. To defeat summary judgment, a plaintiff must make a colorable showing that an adverse action was taken for the purpose of retaliating against him." Mariani-Colon, 511 F.3d at 224 (citations and internal quotation marks omitted).

Additionally, even though "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's discrimination, but doing so is not required, as there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory." DeClaire, 530 F.3d at 19-20 (italics in original).

Lastly, there are instances where issues of fact regarding the veracity of the allegedly pretextual reasons demand that trial be held to resolve them. *See i.e.,* Billings, 515 F.3d at 56 (citations and internal quotation marks omitted) ("But we think that, under the circumstances of this case, it is the jury that must make this decision, one way or another. As we have advised, where a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be particularly cautious about granting the employer's motion for summary judgment. Such

caution is appropriate here, given the factual disputes swirling around the transfer decision.")

### D. Hostile Environment

In retaliation cases, "[t]he adverse employment action may be satisfied by showing the creation of a hostile work environment or the intensification of a pre-existing hostile environment." Quiles-Quiles, 439 F.3d at 9. *See also*, Noviello, 398 F.3d at 89 ("[T]he creation and perpetuation of a hostile work environment can comprise a retaliatory adverse employment action".) "[A] hostile work environment, tolerated by the employer, is cognizable as a retaliatory adverse employment action... This means that workplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for... retaliation cases." *Id*. (under Title VII). "Harassment by coworkers as a punishment for undertaking protected activity is a paradigmatic example of adverse treatment spurred by retaliatory motives and, as such, is likely to deter the complaining party (or others) from engaging in protected activity." *Id*. at 90.

"[R]etaliatory actions that are not materially adverse when considered individually may collectively amount to a retaliatory hostile work environment." Billings, 515 F.3d at 54 n.13.

"In looking at a claim for hostile work environment, we assess whether a plaintiff was subjected to severe or pervasive harassment

that materially altered the conditions of his employment. To sustain a claim of hostile work environment, [plaintiff] must demonstrate that the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive work environment and that the [discriminatory] objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and [that plaintiff] in fact did perceive it to be so." Thompson v. Coca-Cola Co., 522 F.3d 168, 179 (1st Cir. 2008) (internal citations and quotation marks and brackets omitted).

"The environment must be sufficiently hostile or abusive in light of all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Prescott v. Higgins, 538 F.3d 32, 42 (1st Cir. 2008) (citation and internal quotation marks omitted); Rios-Jimenez v. Principi, 520 F.3d 31, 43 (1st Cir. 2008); Torres-Negron v. Merck & Co., Inc., 488 F.3d 34, 39 (1st Cir. 2007).

"There is no mathematically precise test we an use to determine when this burden has been met, instead, we evaluate the allegations and all the circumstances, considering the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance, and

whether it unreasonably interfered with an employee's work performance." Carmona-Rivera v. Commonwealth of Puerto Rico, 464 F.3d 14, 19 (1st Cir. 2006) (citation and internal quotation marks omitted).

"In determining whether a reasonable person would find particular conduct hostile or abusive, a court must mull the totality of the circumstances, including factors such as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." Noviello, 398 F.3d at 92 (citations and internal quotation marks omitted).

Plaintiff must provide "evidence of ridicule, insult, or harassment such that a court could find behavior on the part of the defendants that was objectively and subjectively offensive behavior that a reasonable person would find hostile or abusive." Carmona-Rivera, 464 F.3d at 19 (citation and internal quotation marks omitted). See also, Noviello, 398 F.3d at 92 ("rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim."); De la Vega v. San Juan Star, Inc., 377 F.3d 111, 118 (1st Cir. 2004) (general claims of "humiliating and discriminatory treatment" not sufficient).

"[I]f protected activity leads only to commonplace indignities typical of the workplace (such as tepid jokes, teasing, or aloofness), a reasonable person would not be deterred from such activity. After all, an employee reasonably can expect to encounter such tribulations even if she eschews any involvement in protected activity. On the other hand, severe or pervasive harassment in retaliation for engaging in protected activity threatens to deter due enforcement of the rights conferred by statutes." Noviello, 398 F.3d at 92.

Proving retaliatory intent is crucial. Hence, the purpose behind the harassment must be to retaliate for the protected conduct, that is, it must be motivated by plaintiff's exercise of her statutory rights. Carmona-Rivera, 464 F.3d at 20; Quiles-Quiles, 439 F.3d at 9.

Causation may be established by the temporal proximity between the harassment and the protected conduct. *See, i.e.*, *id*. 439 F.3d at 9 (intensified harassment shortly after filing EEOC complaint).

Even though "[t]he existence of a hostile environment is determined by the finder of fact... that does not prevent a court from ruling that a particular set of facts cannot establish a hostile environment as a matter of law in an appropriate case." Billings, 515 F.3d at 47 n.7.

### E. Plaintiff's Retaliatory Harassment Allegations

Plaintiff alleges that MARRIOTT engaged in retaliatory harassment as a result of both her 2004 and 2005 administrative

charges. It is axiomatic that the filing of these two charges constitute protected activity within the meaning of 42 U.S.C. § 2000e-3(a).

We shall begin by examining the purportedly retaliatory incidents which took place after the filing of plaintiff's March 2004 discrimination charge and those occurring subsequent to her filing the March 2005 retaliation charge in conjunction with defendants' proffered explanations for these events.

## 1. Events after March 2004

Plaintiff cites the following events purportedly arising as a result of her initial discrimination claim filed on March 26, 2004, with the P.R. Department of Labor in support of her allegations of retaliation in this action:[20] (1) failure to transfer plaintiff to a table games supervisor position; (2) unjustified written warning in October 2004; (3) written warning subsequently changed to "coach and counseling" for taking a break longer than half an hour. Further, plaintiff was accused of fraud whereas no other employee had been charged with fraud under similar circumstances; (4) after the warning for taking a longer break plaintiff was required to announce to surveillance every time she was going to or coming from a break and (5) plaintiff's evaluation score dropped from the consistent maximum

---

[20]    See Plaintiff's Motion in Opposition (docket No. 92-2) pp. 29-30.

score of 5 points to 3.5 points, which adversely affected her salary increase.

In response thereto, defendant submitted evidence surrounding the circumstances of the events challenged by plaintiff as follows.

### a.   Failure to Transfer Plaintiff to a Table Games Supervisor Position

The last time plaintiff applied for a Pit Boss position or any other promotion was in March 2004.

Around May 2004 plaintiff requested a lateral transfer to a table games supervisor position. Plaintiff was not selected for the position. Plaintiff has no knowledge of the selection process followed, the criteria applied, nor who the decision makers or the applicants for the position were.

Late 2004 plaintiff requested a transfer to the table games department as a supervisor. There were two vacancies available which were awarded to JOCELYN LEDREW and ORLANDO VEGA.

### b.   Written Warning in October 2004.

On September 10, 2004, MILAGROS QUIÑONEZ, a cashier assigned to the Cage Department, complained in writing that plaintiff had informed her that a co-worker had obtained a higher salary increase.

On October 5, 2004, DEL VALLE showed plaintiff a warning for inappropriate disclosure of confidential information based on this information. Plaintiff rejected the allegations and indicated that she had no access to the evaluations of the Cage personnel. After having listened to plaintiff's explanation, DEL VALLE believed that

CIVIL NO. 05-2108 (RLA)                                          **Page 72**

the warning was not indicated so he helped her prepare a document explaining her position and delivered it to the Human Resources Department.

Plaintiff met with the Human Resources Director ACUÑA and advised him that the allegations contained in the warning were false. ACUÑA asked plaintiff for time to further investigate into the matter. When plaintiff returned to work after her day off, management apologized and plaintiff told that there had been a misunderstanding and that the warning was not supposed to have been given.

The warning, as well as all references to the incident, were removed from plaintiff's personnel file.

### c.   Excessive Meal Period

All Casino employees have a thirty minute meal period. On January 13, 2005, plaintiff took a ninety minute meal period. That is, a full one hour in excess of the meal period allowed to all Casino employees. As a result thereof, DEL VALLE gave her a written warning. She was given the warning because (1) she exceeded the allotted time by a full hour and (2) because she failed to inform her supervisor that she would take a longer meal period.

DEL VALLE had previously advised plaintiff that he could understand if she needed additional time for her meal period but that she had to give him advance notice.

Plaintiff contacted CARLOS CARTAYA, a corporate Human Resources executive at the regional offices, to complain about the written

warning. Plaintiff argued to CARTAYA that another employee also took an excessive meal period and she only received a "coaching and counseling" not a written warning.

CARTAYA asked plaintiff to e-mail all the pertinent information so he could investigate the incident. He told plaintiff not to be concerned about the matter and that he would make all the necessary inquires to solve the situation. On February 17, 2005, plaintiff sent CARTAYA a letter dated February 14, 2005, wherein she related her position regarding the matter.

Shortly thereafter, CARTAYA visited Puerto Rico and met with plaintiff. During the meeting CARTAYA informed plaintiff that his investigation revealed that her allegations were correct and that he would reduce the written warning to a "coaching and counseling".

A "coaching and counseling" is not considered a disciplinary measure.

During plaintiff's review of her personnel file she confirmed that the warning had been crossed out.

CARTAYA advised plaintiff that he was available should she need to contact him in the future. Plaintiff never contacted him again.

### d.   Need to Give Advance Notice to Casino Surveillance

Plaintiff alleges that after the incident involving her excessive meal period she had to inform the Casino surveillance department whenever she took her meal periods. However, during her shift, plaintiff was the highest managerial employee in the Slot

Department. That is, she was in charge of the complete operation of the Slot Department. Thus, plaintiff informed Casino surveillance when she took her meal periods because during that time the Slot Department had no managerial employees.

### e.   The 2004 evaluation

Plaintiff's performance evaluation corresponding to calendar year 2004 which was completed and handed to her in March 2005 was prepared by DEL VALLE. Plaintiff disagreed with each and every aspect of that evaluation.

The performance evaluation form has three levels of performance ratings: Level 1: Key Contributor; Level 2: Solid Performer, and level 3: Sub-performer. Levels 1 and 2 have three tiers each with different salary increases. The evaluation covers various areas of the employee's performance. The evaluator rates each aspect and can comment on each one of them. Then, a global rating is obtained.

Plaintiff received an overall rating of Level 2: Solid Performer and a 3.5% salary increase. Her salary increase for the previous year (2003) had been 4%.

Even though plaintiff claims that she received a poor evaluation in retaliation for her March 2004 discrimination charge, her score was in the upper tier of Level 2. Further, the evaluation was prepared by DEL VALLE who was not involved in the selection process for the Pit Boss vacancy in 2004.

CIVIL NO. 05-2108 (RLA)                                    Page 75

---

### 2. Events after March 2005

Additionally, plaintiff alleges that the following events resulted from her retaliation charge filed on March 24, 2005:[21] (1) plaintiff was suspended from work for allegedly destroying hotel property, i.e., tore pages from a log book; (2) plaintiff received a low evaluation partly because of lack of training despite her requests for training; (3) in December 2005 one of her supervisors embarrassed plaintiff for not kissing him as a greeting gesture and thereafter required that she greet him daily after a change in shifts; (4) the same supervisor attempted to intimidate plaintiff by approaching her in the enclosed vault space.

In response thereto, defendant submitted evidence surrounding the circumstances of the events challenged by plaintiff as follows.

### a.   Logbook Incident

As with other departments, the Slot Department has a hard-bound "logbook" wherein supervisors make notes of the most important events that take place during their shifts. The logbook is used as a commendation tool among supervisors working different shifts.

On October 12, 2005, plaintiff was suspended from Thursday October 13 until Monday, October 17, 2005, pending investigation after she was caught on Casino surveillance video tearing apart eight pages of the Slot Department logbook the day before. Regional

---

[21] Plaintiff's Motion in Opposition (docket No. 92-2) p. 30-31.

CIVIL NO. 05-2108 (RLA)                                              **Page 76**

Security Director RIVERA conducted an investigation into the incident reviewing the video and the logbook and taking statements from several employees. The video revealed that plaintiff tore off several pages of the logbook.

As part of the investigation RIVERA interviewed plaintiff. She admitted that she had ripped up the pages but alleged there was nothing wrong with it. In a written statement plaintiff admitted that she tore apart a page of the logbook after she accidentally tore it.

Based on the video and plaintiff's statement, RIVERA suspended plaintiff pending investigation into the contents of the pages destroyed.

After completing the investigation, RIVERA advised plaintiff that in consideration of her years of service with the Company she would not be terminated but would receive a written warning instead.

Plaintiff returned to her position on October 18, 2005 and was paid her full salary retroactively for the duration of the suspension.

Plaintiff appealed the written warning using the Company's "Peer Review" process.

The "Peer Review" process consists of a panel of employees, or the General manager if so chosen by the employee, which take part in the revision of a disciplinary action upon an employee's request. When an employee requests a Peer Review, he or she is provided with two boxes that contain pieces of paper one with the names of the

hourly employees available to be panelists and the other has the names of the managerial employees available as panelists. The employee takes six names from the hourly employees' box and chooses three whom he or she prefers. Then, the employee takes four names from the managerial employees' box and selects the two managerial employees of his or her preference. Those five individuals comprise the Peer Review panel for that particular case. At a meeting, the employee is given the opportunity to provide his or her version of the facts that led to the disciplinary measure. The manager who applied the discipline then has the opportunity to explain the basis for his or her action. If any one of them wishes to call a witness they may do so. The panelists analyze all the facts and decide whether the disciplinary measure should stand, or whether it should be reduced or eliminated altogether. The panelists' decision is final and binding on the parties.

During the Peer Review, plaintiff had the opportunity to present her version of the events that led to the written warning. As part of her allegations, plaintiff claimed that there was, or should have been, a videotape that would show that she "accidentally" dropped the logbook. ACUÑA informed plaintiff that not only there was no such video but that the video available showed otherwise. However, for purposes of the Peer Review process they would take her contention that the logbook "accidentally fell" as true.

Despite plaintiff's allegations the Peer Review panel upheld the written warning.

### b.    The 2005 Evaluation and Lack of Training

Plaintiff's performance evaluation corresponding to calendar year 2005 which was completed and handed to her in March 2006 was prepared by DEL VALLE. As with the 2004 evaluation, plaintiff alleges that the performance rating given to her was in retaliation for her filing the discrimination charge in March 2004.

Plaintiff's overall rating was Level 2: Solid Performer. Again she received a 3.5% salary increase.

Even though plaintiff claims that she received a "poor" in retaliation for her filing of the March 2004 discrimination charge, her score was comparable to her prior performance evaluation.

On March 27, 2006, plaintiff met with LEVENE to discuss her evaluation. LEVENE agreed with some of plaintiff's allegations and increased her score in two areas.

In April 2005 the Casino was changing its Slot Machines system. Accordingly, some employees were trained on the new system. The idea was to have some employees take the training and have them in turn train the remaining ones.

DEL VALLE selected JANICE CASIANO and LUIS PADILLA for the training. Plaintiff was not selected because it was offered during the latter part of her work shift and there was no one available to cover her position. Allowing her to take the training would have left

CIVIL NO. 05-2108 (RLA)                                          **Page 79**

the Slot Department with no managerial supervision for a prolonged period of time.

Similarly, other employees such as JAVIER MALDONADO, RITA MIRANDA and RAMON CRUZ did not attend the training because they were working while the training was being offered.

Plaintiff complained that she did not receive training on the new Slot Machines and that the trained employees did not teach her the new system as planned. However, she admitted that CASIANO and PADILLA were not able to train her because they did not work in her same shift and she never made arrangements with either them or DEL VALLE for her to come to the Casino earlier or stay after her shift to meet either of them for the training.

In fact, plaintiff - an exempt employee - had insisted many times that she not be required to attend meetings outside her work schedule.

   c.   **Embarrassment Caused by Supervisor for not Kissing Him and Requirement that She Greet Him Daily after Change in Shifts**.

Plaintiff met MALDONADO in December 1994 when the Casino first opened. Even though MALDONADO was plaintiff's direct supervisor, she seldom saw him as they had different work schedules. In fact, by December 2005 a year had elapsed without them interacting.

In December 2005, before a supervisors' meeting commenced, MALDONADO approached plaintiff to greet her with a kiss on the cheek as they sometimes did. Plaintiff instead extended her hand to shake

MALDONADO's. Plaintiff claims that MALDONADO became upset and asked her "what's wrong with you." Plaintiff also claims that MALDONADO's comment was harassing because he addressed her "aggressively" during the supervisors' meeting.

After the December 2005 supervisors' meeting plaintiff did not interact again with MALDONADO until late March 2006, two years after her ADU charge, when he had to work a night shift. When plaintiff arrived to work at 4:00 a.m. she went about her usual routine without informing MALDONADO that she had arrived.

MALDONADO gave plaintiff a "coaching and counseling" for her failure to inform him that she had arrived. Plaintiff requested DEL VALLE to eliminate it which DEL VALLE did.

### d.    The Vault Incident

On June 8, 2006, MALDONADO entered the Slot Department Vault where plaintiff was at the time. MALDONADO went in to pick up documents for a training as well as the associates' checks.

Plaintiff claims that MALDONADO got close to her and rubbed her jacket with his. However, she admits that the vault is a very small room and that he did not talk to her. Plaintiff's Statement of Uncontested Facts ¶ 113 p. 24 (docket No. 82-3). Moreover, the Casino surveillance video clearly shows that MALDONADO did not touch plaintiff, did not rub his jacket with hers nor had any type of contact with plaintiff.

### 3. Conclusion

We begin by examining the events which transpired subsequent to the March 2004 discrimination charge to determine whether, either individually or collectively, they may be deemed sufficiently adverse to meet plaintiff's *McDonnel Douglas* burden. Further, whether these were causally connected to the protected activity. Lastly, assuming a prima facie case of retaliation can be derived from the facts as presented, whether defendants' proffered legitimate non-discriminatory reasons for the challenged events have been adequately challenged as pretextual.

Plaintiff's petitions for transfer to the table games supervisor position were not requests for promotions but rather lateral transfers. The first request was in March 2004 and the other in late 2004. We have no admissible evidence before us to establish how these denials were in any way materially adverse to plaintiff nor how they could have been deemed retaliatory.

The warning issued in October 2004 responded to a written complaint by plaintiff's co-worker. The allegations were serious enough to warrant some personnel action inasmuch as they entailed inappropriate disclosure of confidential information. It is important to note that DEL VALLE himself assisted plaintiff in preparing a document for the Human Resources Department to revisit the matter and that the warning as well as all references thereto were removed from plaintiff's personnel file.

Additionally, faced with the undisputed evidence before us, even assuming plaintiff had met her initial prima facie burden, defendants' non-retaliatory reasons for having issued the warning stand unchallenged.

The written warning prompted by plaintiff having taken a full one hour in excess of her authorized meal period was issued not only because plaintiff exceeded the time allowed but also because she failed to notify her supervisor of her absence. Plaintiff was the highest managerial employee at the Slot Department and in charge of the complete operation. Hence, her absence raised important management considerations which also explain why she was required to subsequently inform the Casino surveillance when she took her meal periods. Apart from the fact that this incident took place on January 13, 2005, that is, close to a year after plaintiff's discrimination charge, defendants' proffered non-retaliatory grounds for their actions stand undisputed.

The difference in plaintiff's 2004 evaluation was not remarkable in comparison with the previous year. Her score was in the upper tier of Level 2 and she received a 3.5% salary increase rather than a 4%. Additionally, there is no evidence in the record of a causal connection between the protected conduct and the evaluation.

With respect to the events subsequent to March 2005, the incident involving the destruction of several log book pages was a serious matter. It was well-documented, including a video, and

culminated in a Peer Review process which upheld the written warning. There is no evidence in the record of retaliatory animus nor of pretext for MARRIOTT's decision.

Again, in the evaluation for the 2005 calendar year plaintiff's overall rating was Level 2: Solid Performer and she received a 3.5% salary increase. Further, defendants submitted ample non-retaliatory grounds justifying plaintiff's lack of training in the new slot machines system which have not been disputed.

The greeting incident involving MALDONADO as well as the "coaching and counseling" due to plaintiff having failed to advise him that she had arrived at work took place close to a year after the retaliation charge had been filed. The record is devoid of any evidence to reflect a causal connection between the events complained of and the protected conduct.

Similarly, the vault incident - which was recorded in the Casino surveillance video - does not evince any type of physical contact nor was there any words exchanged between plaintiff and MALDONADO during the time they shared the constrained area. MALDONADO had a valid non-retaliatory reason for entering the premises, i.e., pick up training documents and the associates' checks. Additionally, we do not find, based on the evidence on record, that the challenged events are objectively and subjectively offensive. There is no indication that they were part of a severe or pervasive retaliatory harassment

pattern which altered plaintiff's conditions of employment so as to amount to a hostile work environment.

Even though the court must review the record in the light most favorable to plaintiff, we find that she failed to establish the existence of material issues of fact regarding her retaliation claim which require resolution at trial. Based on the uncontested evidence presented, no reasonable jury could find that the challenged events were geared to retaliate against plaintiff for having filed the two charges.

Accordingly, the retaliation claim must be **DISMISSED** as a matter of law.

### IX. SUPPLEMENTAL CLAIMS

The court having denied the request for dismissal of the Title VII discrimination claim due to plaintiff's non-selection to the Pit Boss position in March 2004 it may, in its discretion, entertain the state-based claim under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

Thus, defendants' request to dismiss the supplemental claims asserted in the complaint are **DENIED**.

### X. CONCLUSION

Based on the foregoing, defendants' Motion for Summary Judgment (docket No. **82**)[22] is disposed of as follows:

---

[22] See Plaintiff's Motion in Opposition (docket No. **92**); Reply (docket No. **105**) and Plaintiff's Sur-Reply (docket No. **120**).
    Plaintiff is alerted to the fact that translations of the

- Plaintiff's discrimination pattern and practice claim is **DISMISSED** for failure to state a claim. Judgment shall be entered accordingly.

- Plaintiff's discrimination claim based on her non-selection for the Pit Boss positions during the years **1996, 1997** and **1999** is **DISMISSED** as untimely. Judgment shall be entered accordingly.

- Defendants' request to dismiss plaintiff's Title VII sex discrimination claim based on her non-selection to the Pit Boss position in **March of 2004** is **DENIED**.

- Plaintiff's Title VII retaliation claim is **DISMISSED**. Judgment shall be entered accordingly.

- Defendants' request to dismiss plaintiff's supplemental claims is **DENIED**.

IT IS SO ORDERED.

San Juan, Puerto Rico, this 22nd day of December, 2008.

                                    S/Raymond L. Acosta
                                    RAYMOND L. ACOSTA
                            United States District Judge

---

deposition transcript excerpts for: (1) CARLOS OTERO MAESTRE (docket No. 100-9), (2) MARIO CRUZ (docket No. 100-10) and (3) NESTOR DEL VALLE (docket No. 100-11) must be submitted. *See* Frederique-Alexandre v. Dep't of Natural and Envt'l Res. Puerto Rico, 478 F.3d 433, 438 (1st Cir. 2007) ("[t]he law incontrovertibly demands that federal litigation in Puerto Rico be conducted in English, and that untranslated documents are not part of the record on appeal.") (citation and internal quotation marks omitted).